1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BARBARA J. PETERSEN,

               Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.    C04-5183RBL

REPORT AND
RECOMMENDATION

Noted for March 4, 2005

Plaintiff, Barbara J. Petersen, has brought this matter for judicial review of the denial of her application for disability insurance benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on December 13, 1946. Tr. 44. She has a high school education and past work experience as a dry cleaning clerk and real estate sales associate. Tr. 20, 53, 61.

On June 21, 1991, plaintiff filed an application for disability insurance benefits, which was denied

1    initially and not reconsidered. Tr. 390.  She filed a second application for disability insurance benefits on

2    December 15, 1998, alleging disability as of June 21, 1991, due to multiple sclerosis, seizures and arthritis.

3    Tr. 19, 52.  Her second application was denied initially and on reconsideration. Tr. 28-32, 35-37.

4           Plaintiff requested a hearing, which was held on July 6, 2000, before an administrative law judge

5    ("ALJ"). Tr. 597.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did her

6    husband. Tr. 597-619.  On September 11, 2000, the ALJ determined plaintiff to be not disabled, finding

7    specifically that her multiple sclerosis and seizure disorder did not prevent her from performing her past

8    relevant work on or before her date last insured, December 31, 1993. Tr. 391, 395-96.

9           Plaintiff requested review by the Appeals Council, which was granted on August 26, 2002. Tr. 402-

10   03.  The Appeals Council remanded the case to the ALJ to: (1) obtain evidence from a medical expert to

11   clarify the nature and severity of plaintiff's neurological impairments and onset of disabling condition; and

12   (2) if warranted by the record, obtain evidence from a vocational expert to clarify the effect of plaintiff's

13   assessed limitations on her occupational base. Id.

14          At a second hearing held by the ALJ on April 1, 2003, plaintiff was represented by an attorney, and

15   a medical expert and a vocational expert appeared and testified. Tr. 19, 620-37.  However, plaintiff did not

16   appear. Tr. 19.  On August 11, 2003, the ALJ again determined plaintiff to be not disabled as of her date

17   last insured, finding in relevant part as follows:

18          (1)    at step one of the disability evaluation process, plaintiff had not engaged in
                   substantial gainful activity since her alleged onset date of disability;
19
20          (2)    at step two, from June 21, 1991, through December 31, 1993, plaintiff had
                   "severe" impairments consisting of "possible multiple sclerosis, a seizure
21                 disorder, carpal tunnel syndrome, and left knee degenerative disease";

22          (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of
                   those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

23          (4)    at step four, plaintiff was able to perform a significant, though modified, range of
24                 light work; and

25          (5)    at step five, plaintiff was able to perform a significant number of other jobs
                   existing in the national economy.

26   Tr. 26-27.  On March 12, 2004, the Appeals Council denied plaintiff's request for review of her second

27   application, making the ALJ's decision the Commissioner's final decision. Tr. 9-12; 20 C.F.R. § 404.981.

28          On March 31, 2004, plaintiff filed a complaint with this court seeking judicial review of the ALJ's

second decision. (Dkt. #1).  Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits for the following reasons:

    (a)    the ALJ failed to properly evaluate the March 1999 opinion of Dr. George W. Wambaugh, one of plaintiff's treating physicians;

    (b)    the ALJ erred in not finding plaintiff's obesity, high cholesterol and high blood pressure to be severe;

    (c)    the ALJ erred in assessing plaintiff's credibility and the credibility of her husband;

    (d)    the ALJ erred in assessing plaintiff's residual functional capacity;

    (e)    the ALJ erred in finding plaintiff capable of performing other jobs in the national economy; and

    (f)    the ALJ *sub silentio* re-opened plaintiff's prior 1991 application for disability insurance benefits.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    Plaintiff Must Establish Disability Prior to Her Date Last Insured

To be entitled to disability benefits, plaintiff "must establish that her disability existed on or before" the date her insured status expired.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status).  In other words, plaintiff will not be found disabled, and therefore will not be entitled to disability benefits, if she fails to establish she was disabled prior to or as of her date last insured, December 31, 1993.

1    Tr. 391; <u>Tidwell</u>, 161 F.3d at 601.

2    II.    <u>The ALJ Properly Evaluated Dr. Wambaugh's March 1999 Opinion</u>

3            The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

4    medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

5    record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

6    ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's

7    conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595,

8    601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

9    fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical

10   experts "falls within this responsibility." <u>Id.</u> at 603.

11           In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

12   supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

13   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

14   thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

15   <u>Sample</u>, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

16   ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

17           The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

18   either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

19   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

20   legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

21   ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

22   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

23   why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

24   (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

25           In general, more weight is given to a treating physician's opinion than to the opinions of those who

26   do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

27   a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

28   <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th

Cir. 2001); <u>Magallanes</u>, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

Plaintiff argues the ALJ erred in evaluating the March 1999 opinion of Dr. George W. Wambaugh, one of her treating physicians.  With respect to that opinion, the ALJ found in relevant part as follows:

> In terms of medical opinions, the only one of much interest is Dr. Wambaugh who opined in [March] 1999 that the claimant had multiple sclerosis in 1991 and she "*is*" (present tense) significantly disabled and cannot walk well (Exhibit 3F. p. 6).  That is no doubt true in 1999, but he does not say it was true in 1991.  His treatment notes from 1991 do not show the diagnosis at that time.  Basically, he passed her symptoms off as the residuals of a head injury or related them to seizures (Exhibit 3F, pp. 46-47).  He never diagnosed multiple sclerosis.  Thus, he cannot opine now what her condition was then due to multiple sclerosis. . . . I do not reject Dr. Wambaug[h]'s opinion that the claimant is currently disabled, but question his opinion that she had multiple sclerosis in 1991 since he did not diagnose it then.  Dr. Searle was her treating doctor, and he did not diagnose it either, but was only treating her for a variety of minor concerns and seizures.

Tr. 23-24 (emphasis in the original).  Plaintiff asserts that in making these findings, the ALJ erroneously concluded that because Dr. Wambaugh did not diagnose her with multiple sclerosis when he examined her in 1991, he could not later do so in 1999.  Plaintiff further asserts the ALJ's error in this regard is due to his misunderstanding of the role of retrospective diagnoses in evaluating disability.  However, the undersigned finds that the ALJ did not err in evaluating Dr. Wambaugh's March 1999 opinion.

Claimants applying for benefits "for a current disability after the expiration of their insured status," will be entitled to such benefits only if they prove their "current disability has existed continuously since a date on or before the date that their insurance coverage lapsed." <u>Flaten</u>, 44 F.3d at 1462.  The existence of continuous disability may be established through the use of "[r]etrospective diagnoses." <u>Id.</u> at 1461 n.5.  To that extent, medical diagnoses "made after the period for disability are relevant to assess the claimant's disability" during that period. <u>Smith v. Bowen</u>, 849 F.2d 1222, 1225 (9th Cir. 1988); <u>Kemp v. Weinberger</u>, 522 F.2d 967, 969 (9th Cir. 1975).  Because such diagnoses "are inevitably rendered retrospectively," they "should not be disregarded solely on that basis."[1] <u>Smith</u>, 849 F.2d at 1225 (citing <u>Bilby v. Schweiker</u>, 762

---

[1] Thus, plaintiff is correct that retrospective diagnoses may be considered as relevant evidence, and may not be disregarded on the sole basis that they are retrospective in nature.  Plaintiff's reliance on Social Security Ruling ("SSR") 83-20 to argue the ALJ improperly evaluated Dr. Wambaugh's opinion, however, is misplaced.  SSR 83-20, as pointed out by plaintiff, discusses the relative evidence to be considered when establishing the onset date of disability.  SSR 83-20 comes into play though

1   F.2d 716, 719 (9th Cir. 1985)).

2         Here, plaintiff misreads the ALJ's finding regarding Dr. Wambaugh's March 1999 opinion.  The

3   ALJ was not questioning Dr. Wambaugh's ability to make retrospective diagnoses per se, or rejecting his

4   opinion solely on the basis that his diagnosis of multiple sclerosis had been made in 1999, but not in 1991.[2]

5   Rather, the ALJ found that Dr. Wambaugh's 1991 diagnostic notes and the medical evidence as a whole,

6   including the lack of a multiple sclerosis diagnosis from any medical source at that time, failed to establish

7   plaintiff had any significant limitations resulting from her multiple sclerosis prior to her date last insured.  As

8   such, the undersigned finds the medical evidence in the record supports the ALJ's findings.

9         A.   Plaintiff's treating physicians

10        Plaintiff has been treated by a number of physicians in addition to Dr. Wambaugh.  In July 1986,

11   plaintiff told Dr. R. Aubrey she had experienced three episodes of "significant light headedness" during the

12   past two weeks. Tr. 560.  However, she also reported that these episodes lasted for only "a few seconds."

13   Id.  Dr. Aubrey diagnosed her with "[m]ild syncopal episodes." Id.  While plaintiff reported in April 1987,

14   that she still did not feel "completely up to par," she was experiencing "no more of the dizzy spells," and

15   Dr. Aubrey noted her laboratory studies were all normal. Tr. 559.

16        In May 1988, Dr. A. J. Searle diagnosed plaintiff with "[e]pisodes of near syncope." Tr. 551.  He

17   found it "very hard to know," however, what was causing the episodes, as they were "so infrequent," and

18   her laboratory work was normal. Id.  In August 1989, plaintiff reported "paresthesia associated with the left

19   cervical distribution," which seemed "to be resolving." Tr. 537.  She also reported intermittent episodes of

20   "near faint" for the past two years, that would "resolve spontaneously" without "any residual problems"

21   after "about a minute to a minute and a half." Id.  She further reported a "general non-specific feeling of

22

23   _____

24   only after a claimant  has met the "ultimate burden" of proving disability prior to the expiration of his or her insured status.
     Armstrong v. Commissioner of the Social Security Administration, 160 F.3d 587, 590 (9th Cir. 1998).  In other words, it is only
     when the claimant has established disability and the "record is ambiguous as to the onset date of disability," does SSR 83-20
25   require the ALJ to "assist the claimant in creating a complete record" that "forms a basis for" establishing a disability onset date.
     Id.  Here, because, as explained below, the ALJ properly found plaintiff to be not disabled, he was not required to rely on SSR83-
26   20.

27        [2]This is not to say, however, that the ALJ may not discredit a treating physician's opinion at least in part because it
     conflicts with an earlier opinion that physician provided. See Reddick, 157 F.3d at 722 (ALJ is responsible for resolving conflicts
28   in medical evidence); Sample, 694 F.2d at 642; see also Morgan, 169 F.3d at 603 (determining whether inconsistencies in medical
     evidence are relevant to discount opinion falls within ALJ's responsibility).  To the extent the ALJ did that here, he did not err.

being unwell," but Dr. Searle noted her neurological symptoms were resolving. Id.

Dr. Searle observed in July 1990, that plaintiff's EEG and MRI studies, and all of her neurological evaluations, had been negative. Tr. 530.  Plaintiff reported feeling "a bit better" since being on medication for depression, and her husband stated she had "more energy" as well. Tr. 529.  Plaintiff reported another episode of dizziness in August 1990, which resolved shortly thereafter. Tr. 528.  She told Dr. Searle she got them only "about once every 6 weeks." Id.  He assessed her with a "[p]ossible affective disorder," and in December 1990, diagnosed her with lethargy. Tr. 524, 528.  Plaintiff reported a seizure in March 1991, but her examination was "essentially normal." Tr. 90.  She did appear to be "a little bit slow to respond at times," but Dr. Searle felt she could "recommence driving in about 3 months time." Tr. 284-85.

In July 1991, plaintiff presented to Dr. Wambaugh with "a five year history of brief spells," which she described "'like a veil over [her] face.'" Tr. 164.  Dr. Wambaugh noted that while she had experienced one such episode back in May 1990, plaintiff "did well" up until March 1991, when she had another one. Id.  Plaintiff was switched to Tegretol, which she tolerated well, after which she experienced "no further seizures." Id.  While she had some decreased sensation on the left side of her face and in her right arm and leg, and "a very slight" decrease in sensation in her left hand, she had normal strength and gait. Id.

Although Dr. Searle found plaintiff had some abnormal neurological signs in late 1991, he noted an MRI of her brain performed earlier that year was normal. Tr. 280-81, 319.  In November 1991, plaintiff told Dr. Wambaugh she had suffered "no further seizures" since her last visit. Tr. 163.  She also had only "mild left sided spastic weakness" and only a slight decrease in sensation in her left hand. Id.  Her seizure disorder was found to be "controlled on Tegretol." Id.  Plaintiff told Dr. Searle in January 1992, that she continued to have dizziness. Tr. 278.  He felt it probably was "related to medications," and diagnosed her with a seizure disorder and "unsteadiness." Id.  In March 1992, Dr. Searle noted that her dizziness had improved. Tr. 277.  In October 1992, plaintiff told Dr. Searle she had suffered "[n]o recent seizures" on her current medication, although she still experienced dizziness "at times." Tr. 274.

In May 1993, while plaintiff reported numbness in the fingertips of her left hand, Dr. Searle noted her symptoms were "not progressive, only mild," and thus he recommended no further treatment at that time. Tr. 158.  In September 1993, plaintiff's extremities were found to be within normal limits, and that she had no motor or sensory deficit. Tr. 89.  In November 1993, Dr. Searle assessed her with a "[l]imited

1   physical, seizure disorder," and deemed her "okay to drive." Tr. 155.

2         Also in November 1993, plaintiff told Dr. Alan B. Wood that she had "at least a one year history of

3   numbness and tingling" in three fingers of her left hand. Tr. 154.  She also reported having been diagnosed

4   with carpal tunnel syndrome. Id.  Dr. Wood noted, however, that she was "not under active treatment" and

5   that she was "not awakened at night" by her symptoms. Id.  On examination, plaintiff also had full range of

6   motion in her left upper extremities. Id.  Dr. Wood diagnosed her with tendinitis and a history of left carpal

7   tunnel syndrome. Id.

8         Plaintiff was not examined again until Dr. Searle saw her in May 1995.  At that time, she was noted

9   to have "an unsteady gait." Tr. 150.  However, cerebellar testing for ataxia of the hands was negative. Id.

10  While Dr. Searle assessed her with unsteady gait and "left-sided hemiparesis" in July 1995, he noted that a

11  second MRI of her brain was again negative. Tr. 249, 306.  Also in July 1995, plaintiff told Dr. Wambaugh

12  she had experienced "no further seizures" since switching to Tegretol. Tr. 148.  She did report that she had

13  developed "problems with balance and coordination," but only for "the past several months." Id.  Although

14  plaintiff had difficulty standing with her feet together, her sensation was normal and she had only mild left-

15  sided weakness. Id.  Dr. Wambaugh found her seizure disorder to be "under good control." Id.

16        In June 1996, Dr. Searle assessed plaintiff with multiple sclerosis, which he felt had improved since

17  she was put on prednisone. Tr. 227.  In February 1997, Dr. Wood noted that since she had been diagnosed

18  with multiple sclerosis in January 1996, plaintiff had been having "increasing unsteadiness of walking" and

19  "some varying amounts of decreased sensation in her lower extremities." Tr. 140.  He also noted she had a

20  loss of sensation associated with her multiple sclerosis and "some motor weakness." Tr. 141.

21        In November 1998, however, Dr. Searle noted that plaintiff's multiple sclerosis had not progressed

22  significantly. Tr. 128.  In January 1999, she also told Dr. Wood that her multiple sclerosis was "very slowly

23  progressing," and that she had not experienced any seizure symptoms for the past eight years. Tr. 111.  Her

24  strength and sensation were intact, as was her coordination and gait, although they were also mildly ataxic.

25  Id.  She exhibited functional range of motion "without significant pain or deformity." Id.

26        In March 1999, Dr. Wambaugh noted that plaintiff had reported "complaints of tingling into her

27  hands and intermittent numbness" back in 1991. Tr. 121.  He further noted that when plaintiff returned to

28  him for further examination in 1995, while an initial MRI of her head was negative, an MRI of her cervical

spine showed findings that were compatible with multiple sclerosis. Id.  He stated that since that visit, she

had developed weakness in her legs, a wide-based spastic gait, and spastic tone in her lower extremities,

that were "not present" in 1991. Id.  Plaintiff also reported that since her 1995 visit, she had "deteriorated

somewhat" with further leg weakness, increasing ataxic gait, occasional leg collapse, lessening control of

her hands, loss of fine motor dexterity, and worsening hand numbness. Id.

On examination, Dr. Wambaugh found plaintiff had some decrease in motor strength in her right

upper extremities and some decreased sensation in her right had. Tr. 121.  She also had a "broad-based very

unsteady ataxic gait," that required a cane to keep her from falling, and other abnormal neurological

findings, although her cranial nerves were intact. Tr. 121-22.  Dr. Wambaugh diagnosed plaintiff with

"[m]ultiple sclerosis, exacerbating and progressive with the date of onset of 1991 or earlier," stating that

she had signs indicative of that disease as far back as 1991. Tr. 122.  He then opined as follows:

> It is clear this patient is significantly disabled, has difficulty even on routine ambulation
> and is at severe risk of falling and is at significant risk of some future loss of ambulation
> entirely.  Along with her loss of fine hand dexterity and sensory loss in her fingers and
> hands, weakness, and the fact that she is ataxic, makes her totally disabled in my
> opinion, due to the diagnosis of multiple sclerosis.

Tr. 122-23.  In April and May 1999, Dr. Wambaugh noted that medication was keeping plaintiff relatively

stable, although she had developed myofascial pain in her left neck, head and shoulder. Tr. 117, 119.  A CT

scan of plaintiff's head, however, showed no bony lesions. Tr. 117.  In October 1999, Dr. Searle observed

that plaintiff was having "some problems with disability" due to her multiple sclerosis. Tr. 485.

In April 2000, Dr. Wambaugh again found plaintiff had "exacerbating and secondarily progressive

multiple sclerosis" and related symptoms, although he noted her to be "neurologically stable." Tr. 478-79.

In June 2000, Dr. Searle found plaintiff to be "more unsteady than she use[d] to be," and in September

2000, he felt her to be "markedly reduced in her ability to get around." Tr. 467.  On the other hand, while

plaintiff reported her multiple sclerosis had been slowly progressing, she emphasized it was "quite slow" and

she had "minimal concerns" at that time. Id.  Dr. Searle estimated her multiple sclerosis probably had been

present for about thirteen years. Id.

In July 2001, Dr. Searle estimated her multiple sclerosis probably had been present for at least ten

years. Tr. 455.  In August 2001, plaintiff told Dr. Wood she had "no symptoms" in her left knee, which was

"very stable." Tr. 454.  In September 2001, Dr. Searle noted plaintiff had "generalized weakness" in her left

1 arm, which he found to be consistent with her history of multiple sclerosis. Tr. 449.

2      Thus, while it may be true as Dr. Wambaugh opined in March 1999, that plaintiff showed possible

3 signs and symptoms of multiple sclerosis as far back as 1991, none of her treating physicians, including Dr.

4 Wambaugh diagnosed her with that disease prior to her date last insured.  Further, Dr. Wambaugh did not

5 opine that plaintiff was disabled or significantly limited by her multiple sclerosis at that time or at any time

6 prior to her date last insured.  Rather, as noted by the ALJ, Dr. Wambaugh's March 1999 opinion speaks

7 only in terms of plaintiff's "present" disability, i.e., her current condition at the time of that opinion.  Nor, as

8 can be seen by the summary of the medical evidence in the record set forth above, did any other treating

9 physician (including Dr. Searle, who examined plaintiff on many more occasions than did Dr. Wambaugh)

10 find plaintiff to have been so limited during the relevant time period.

11      B.    <u>Medical expert's testimony</u>

12      Plaintiff also argues the ALJ improperly evaluated the testimony of the medical expert, Dr. Robert

13 B. Aigner, concerning Dr. Wambaugh's March 1999 opinion.  With respect to Dr. Aigner's testimony, the

14 ALJ found in relevant part as follows:

15         Dr. Aigner testified that the claimant may have had some minor symptoms such as
        occasional facial numbness.  However, the cause of it was not clear in view of the

16         normal MRI (Exhibit 3F, pp. 166, 191).  It was not until later, in 1995, that things
        started to deteriorate.  Then, the MRIs began to show multiple sclerosis (Exhibit 3F, pp.

17         190, 106).  At that point, doctors determined that she had multiple sclerosis and began
        treatment.  This was well after December 31, 1993, the date she was last insured.  Thus,

18         the evidence is not relevant for establishing disability for this case.

19 Tr. 23.  Plaintiff argues the ALJ's findings inaccurately paraphrase the testimony of Dr. Aigner, which, if

20 fairly read, support Dr. Wambaugh's March 1999 opinion.  The undersigned, however, finds this argument

21 to be without merit.

22      In support of her argument, plaintiff points to that portion of Dr. Aigner's testimony in which he

23 states that: (1) the left arm and right leg numbness and the left hand finger tingling plaintiff had prior to her

24 date last insured "probably" were related to her multiple sclerosis; and (2) those symptoms, combined with

25 plaintiff's other symptoms, "might" have been disabling.  While plaintiff may be correct in stating that Dr.

26 Aigner did so testify (<u>See</u> Tr. 628-29), she misses the point.  Even if Dr. Aigner's testimony may be read as

27 supporting the opinion of Dr. Wambaugh that plaintiff exhibited signs and symptoms of multiple sclerosis as

28 far back as 1991, that testimony also clearly shows that those signs and symptoms were not significantly

REPORT AND RECOMMENDATION
Page - 10

1   limiting until well after plaintiff's insured status had expired.

2          Based on the medical evidence in the record, Dr. Aigner testified that after experiencing a seizure in

3   1991, plaintiff was placed on Tegretol, and that subsequent to that, "from a disability standpoint," it did not

4   appear that her seizure disorder had been a significant problem. Tr. 624.  Thus, Dr. Aigner testified, "things

5   sort of died down after she got on the medications," at least up until 1993. Tr. 625.  He further testified that

6   although plaintiff had some symptoms of numbness and fatigue in 1990 and 1991, an MRI performed at the

7   time was normal, and thus he did not think "it was really clear that she had [multiple sclerosis] at that

8   point." Id.  Dr. Aigner also noted there was not much in the medical record regarding plaintiff's medical

9   condition between 1993 and 1995. Id.

10         Dr. Aigner testified that it was not until 1995, "when things began to break loose." Id.  It was at that

11  time, Dr. Aigner testified, that plaintiff began to have more unsteadiness, that her gait was off, and that she

12  was found to have abnormal reflexes. Id.  It was also at that time that an MRI of plaintiff's neck and other

13  examination findings showed she had lesions in her cervical spine that were probably indicative of multiple

14  sclerosis. Tr. 625-26.  Dr. Aigner testified that 1995 was the first time she had "a real impairment" due to

15  her multiple sclerosis, explaining further in relevant part that:

16         First of all, she's not seen very much between '91 and '95 except for her gallbladder
           surgery.  But it's around '95 that she starts noticing that she's having trouble with her
17         balance and gait and so forth.  And certainly, from that time on I think there's no
           question that she has disability related to [multiple sclerosis].  But I can't squeeze it back
18         further than '95, unless there's some other reports that I'm not aware of. . . .

19         [S]he has the MRI of her brain which is normal.  Then two MRI's of the cervical spine
           after '95, both of which were abnormal. . . . Now it's not to say she didn't have
20         symptoms.  But again, she seemed to be walking okay.  They said she could drive.  She
           had these subjective complaints of numbness, fatigue, and so forth.  But in themselves,
21         I'm not sure they were enough to be disabling. . .

22         [N]ormally when fatigue becomes a factor as far as [multiple sclerosis] is concerned, it's
           when other things are coming along too.  I mean, usually you don't have a major
23         disability based on fatigue alone without other associated neurologic findings.  As I say,
           they worked her up at that time and felt it was stress-related.  I don't know if that was a
24         factor or not.  I can't be sure. . . .

25         [S]he had a lot of subjective complaints during that time. . . . They may have been the
           manifestation of early [multiple sclerosis], but on the basis of what was found, there
26         wasn't enough objective findings to say they would've been disabling to her at that time.
           . . .
27
           Probably, [the reports of numbness in plaintiff's left arm and right leg and tingling in her
28         left fingers are multiple sclerosis-related] in retrospect.  But again in terms of the
           severity, they seem to vary from one side to the other.  They were not enough -- they

were not associated with impairment of function at that time to rate her under the category of [multiple sclerosis] abnormalities. . . .

I don't think there's any question she's disabled now. . . . I can only say you can have [multiple sclerosis] and not meet the requirements . . . You can have that for several years before it gets bad enough. And as I say, reviewing those records, particularly the ones of Dr. Wambaugh in '91, she had numbness of the face and mild sensory loss on the right side. He didn't talk about ataxia or clumsiness. At that time he noted she had positive [Babinski signs], you know, but did not find enough disability associated with it to make that a significant finding.

Tr. 626-29. Thus, while Dr. Aigner testified that in retrospect plaintiff may have had signs and symptoms related to her multiple sclerosis, he made it clear that none of them, either by themselves or in combination, were significantly limiting, let alone disabling, prior to her date last insured. See Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995) (mere diagnosis of impairment does not establish disability).

In addition, it is true that Dr. Aigner testified that "in somebody who has a disability," obesity, high cholesterol, high blood pressure, and knee problems "would certainly contribute to additional problems." Tr. 626 (emphasis added). As discussed above, however, Dr. Aigner testified that plaintiff did not become significantly limited or disabled due to her multiple sclerosis until 1995 at the earliest. While Dr. Aigner also testified that she "might or might not" have been disabled prior to her date last insured, depending on how many symptoms she had from other medical problems (Tr. 629), such equivocal testimony hardly constitutes substantial evidence to support a finding of disability. In addition, as explained below, the ALJ did not err in declining to find plaintiff's obesity, high cholesterol and high blood pressure severe.

Finally, the weight of the medical evidence in the record fails to show that plaintiff's knee problems caused her any significant limitations prior to the expiration of her insured status. Although plaintiff had "considerable crepitance and discomfort with patellar grind" in her right knee in April 1987, she had good range of motion and only slight effusion. Tr. 550. She was found to have no clubbing, cyanosis or edema in her extremities in March 1991. Tr. 515. Although she was diagnosed with probable degenerative joint disease in January 1992, there was "no obvious ligamentous instability of the right knee joint" at that time. Tr. 278. Her extremities were found to be within normal limits in September 1993. Tr. 89.

Even after plaintiff's insured status expired, the medical evidence in the record is at most equivocal with respect to the severity of her knee impairments. It was not until November 1994, that x-rays revealed marked degenerative joint disease in her left knee. Tr. 146, 311. In October 1996, plaintiff reported having left knee pain, although she was not taking any medication for it. Tr. 146. She had left knee pain again in

1   mid-January 1997. Tr.145.  Later that month, however, she had less knee pain, "minimal" effusion, "near

2   full" range of motion, and no tenderness. Tr. 143.  While x-rays again showed marked degenerative joint

3   disease, plaintiff's knee was deemed stable, except for some "mild pseudo-laxity." Tr. 143, 299.

4       Plaintiff reported a "several year history of slowly worsening left, greater than right" knee pain in

5   February 1997, but Dr. Wood found only "minimal tenderness and no significant laxity" in that knee. Tr.

6   140-41.  He also found no knee effusion. Tr. 141.  Plaintiff further reported having non-surgical treatment

7   for a right ankle fracture in December 1994, for which she was not currently symptomatic. Tr. 140-41.

8   Although x-rays showed marked degenerative joint disease in plaintiff's left knee in November 1998, Dr.

9   Searle found that knee to be stable. Tr. 128, 294.  In January 1999, plaintiff underwent a total replacement

10  of her left knee, and was noted to be doing well with respect to that in March 1999. Tr. 124, 172.

11      Plaintiff reported increasing right knee symptoms in July 2001, and Dr. Searle assessed her with

12  right knee degenerative joint disease. Tr. 455.  Plaintiff told Dr. Wood that she had "no symptoms" in her

13  left knee, which was "very stable." Tr. 454.  She also told him that her medication "helped a lot" with her

14  right knee, that she was "not kept awake at night by the pain," that she was "ambulatory and functional,"

15  and that the knee did not feel "unstable or wobbly." Id.  She further reported that her right knee symptoms

16  had become "minimal" and "very tolerable," and that she had "good stability" in that right knee with no

17  tenderness, although she was diagnosed at that time with right knee osteoarthritis. Id.

18      C.      Plaintiff's 1995 MRI scans

19      Finally, plaintiff argues the normal brain MRI she had in August 1991, is irrelevant as to whether she

20  had multiple sclerosis at that time, because MRI examinations of her brain done in 1995, still showed

21  negative results.[3] Tr. 301, 306, 319.  This is because, she asserts, evidence of her multiple sclerosis was

22  present not in her brain, but rather in her cervical spine, evidence that showed up in MRI examinations of

23  her cervical spine the same year. Tr. 302, 305.  Plaintiff thus appears to imply that had an MRI been taken

24  of her cervical spine back in 1991, this would have showed she had multiple sclerosis at that time.

25      Plaintiff's argument, however, assumes too much.  There is nothing in the record to suggest that an

26  MRI of her cervical spine performed in 1991 would have produced positive results, and no medical source

27

28      [3]The report of the second brain MRI, which was performed in December 1995, actually found that while the MRI
    remained "suspicious for a demyelinating process," it otherwise appeared "within normal limits." Tr. 301.

in the record, including Dr. Wambaugh and Dr. Aigner, has so opined.  Even if an MRI perfromed at that time would have produced such results, there is no evidence, as discussed above, that plaintiff's multiple sclerosis signs and symptoms prior to her date last insured were significantly limiting, let alone disabling.  Thus, while it is theoretically possible a cervical spine MRI done in 1991 could have shown abnormal findings, plaintiff still has the burden of proving she was <u>disabled</u> on or before the expiration of her insured status.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  This she has not done.

III.   <u>The ALJ Properly Did Not Find Plaintiff's Obesity, High Cholesterol and High Blood Pressure to Be Severe</u>

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step sequential evaluation process. 20 C.F.R. § 404.1520.  At step two of this process, the ALJ must determine if an impairment is "severe". Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a); SSR 96-3p.  Basic work activities consist of those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 140.1521(b); SSR 85- 28; SSR 96-3p.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual['s ability to work."  See SSR  85-28; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that her "impairments or their symptoms affect [her] ability to perform basic work activities."  Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell, 161 F.3d at 601.  Plaintiff will not be found disabled if she fails "to establish she had a severe impairment" on or before her date last insured.  Tidwell, 161 F.3d at 601.

The ALJ found that prior to plaintiff's date last insured, she had severe impairments consisting of multiple sclerosis, a seizure disorder, carpal tunnel syndrome, and left knee degenerative disease.  Plaintiff argues that the ALJ erred in not finding her obesity, high cholesterol and high blood pressure to also be severe.  To support this argument, she points to the testimony of Dr. Aigner that they were a "fair amount of problem" for her. Tr. 626.  Dr. Aigner's actual testimony though was that while all of those impairments "sound like they're a fair amount of problem," he did not think they were significant "in themselves." Tr. 626.  Dr. Aigner further testified that only "in somebody who has a disability," would such impairments "contribute to additional problems." Tr. 626-27.  As discussed above, however, the medical evidence in the

1   record simply does not show plaintiff was disabled prior to her date last insured.

2        The medical evidence in the record also supports Dr. Aigner's testimony that plaintiff's obesity, high

3   cholesterol and high blood pressure were not in themselves significant impairments.  Plaintiff was noted to

4   be "quite obese" in May 1988. Tr. 554.  However, no significant functional limitations related to her obesity

5   were noted. Id.  Although it was noted in January 1993, that plaintiff's "morbid obesity, severe

6   hypercholesterolemia, and elevated blood pressure" put her at "significant risk for cardiovascular events,"

7   again no current functional limitations were found. Tr. 159-60.  No other medical source in the record, for

8   that matter, either before or after plaintiff's date last insured, has found any such limitations.[4]

9   IV.    The ALJ's Erroneous Credibility Assessment of Plaintiff and Her Husband Was Harmless

10      A.    Plaintiff's credibility

11       Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

12  639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

13  F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

14  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

15  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

16  as that determination is supported by substantial evidence.  Tonapetyan, 242 F.3d at 1148.

17       To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

18  disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

19  and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12

20  F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's

21  reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The

22  evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th

23  Cir. 2003).

24       In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

25  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

26  testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

27

28        [4]Indeed, in mid-January 1997, plaintiff reported that normally "she does not have problems with her blood pressure."
Tr. 145.  Later that month plaintiff was described as being "moderately overweight" and in no apparent distress. Tr. 143.

also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Plaintiff argues the ALJ erred in assessing her credibility.  At the April 2003 hearing, the ALJ made the following findings regarding plaintiff's credibility:

> As the claimant did not appear at the hearing, I was not able to assess her credibility this time.  At the September[5] 2000 hearing I found her to be credible, but the problem was that she answered mostly in the present tense, as did her husband.  They were testifying concerning her functioning seven years or more back.  I doubted that they were intentionally prevaricating.  Nevertheless, they ran their timeframes together using the present to describe the past.

Tr. 23.  In challenging the ALJ's findings, plaintiff asserts that most of her answers to questions during the July 2000 hearing were in the past tense, and provided recollections regarding her limitations prior to her date last insured.  Plaintiff further asserts that those recollections were corroborated by her medical records at that time.

While a review of the July 2000 hearing transcript fails to indicate plaintiff answered mostly in the present tense as the ALJ found, that error was harmless. See Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying the harmless error standard); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error).  To be disabling, a mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908.  In other words, it must be established by medical evidence "consisting of signs, symptoms, and laboratory findings," not only by the claimant's "statement of symptoms." Id.

As discussed above, however, the medical evidence in the record simply does not establish plaintiff had a disabling impairment at any time prior to her date last insured.  Plaintiff testified that prior to her date last insured she: felt very tired; had "black out" spells; had vision problems involving feeling like she had a "veil" over her face; experienced numbness in her hands, arms, legs and face; stopped doing household chores; felt "rotten" and "bad" and "ached all over"; stopped doing social activities for fear of having a seizure in public; had problems with memory and concentration; and fell down at the beach once in 1991. Tr. 603, 605, 607-09.  On the other hand, the medical evidence, while indicating, for example, that plaintiff

---

[5]This hearing was actually held in July 2000. Tr. 597.

1  reported having fatigue, dizzy spells, numbness, and unsteadiness, none of her treating physicians deemed

2  her to be significantly limited by her symptoms prior to the expiration of her insured status.[6]

3         Plaintiff's other arguments for seeking reversal of the ALJ's decision based on the ALJ's improper

4  credibility findings also are without merit.  Plaintiff argues that pursuant to SSR 83-20, the ALJ should have

5  used her testimony to determine the severity of her limitations prior to her date last insured.  As explained

6  above, however, because the ALJ properly found plaintiff to be not disabled, SSR 83-20 was not applicable,

7  and the ALJ thus was not required to rely on it.

8         Plaintiff further argues the ALJ erred in stating there was no evidence that she had problems with

9  dizziness and seizures during the period she began her anti-seizure medication and before her insured status

10  expired.  The undersigned disagrees.  First, the ALJ did not make the above statement with respect to

11  plaintiff's dizziness. Tr. 21-22.  Second, the evidence in the record supports the ALJ's finding regarding

12  plaintiff's seizures.  In July 1991, Dr. Wambaugh noted that after plaintiff had been switched to Tegretol,

13  she experienced "no further seizures." Tr. 164.  In November 1991, plaintiff reported she had experienced

14  "no further seizures" since her last visit. Tr. 163.  Dr. Wambaugh found plaintiff's seizure disorder to be

15  "controlled on Tegretol." Id.  In July 1995, Dr. Wambaugh again stated that plaintiff had experienced "no

16  further seizures" since she switched to Tegretol. Tr. 148.  In January 1999, plaintiff told Dr. Wood that she

17  had not experienced any seizure symptoms for the past eight years. Tr. 111.  Finally, plaintiff testified that

18  she had experienced no further seizures since being switched to Tegretol. Tr. 604-05.

19         B.     Testimony of plaintiff's husband

20         Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

21  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

22  each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

23  testimony if it conflicts with the medical evidence. Id.; Vincent, 739 F.2d at 1395 (proper for ALJ to

24  discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ

25  need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are

26

27         [6]Thus, the undersigned also rejects plaintiff's argument that her testimony must be "credited as true" under Lester v.
Chater. See Lester, 81 F.3d at 834 ("[W]here the ALJ improperly rejects the claimant's testimony regarding [her] limitations,
and the claimant would be disabled if [her] testimony were credited, 'we will not remand solely to allow the ALJ to make specific

28  findings regarding that testimony.'") (citing Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1401 (9th
Cir.1988)) (emphasis added).

REPORT AND RECOMMENDATION
Page - 17

1    noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial

2    evidence supports the ALJ's decision. <u>Lewis</u>, 236 F.3d at 512.  The ALJ also may "draw inferences

3    logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.

4         Plaintiff argues the ALJ erred in discounting the credibility of plaintiff's husband for essentially the

5    same reasons she challenges the ALJ's findings regarding her credibility.  While the ALJ did not expressly

6    reject the testimony of plaintiff's husband, plaintiff asserts, the ALJ adopted a residual functional capacity

7    less severe than the limitations described by her husband.  As with plaintiff, the ALJ appears to have

8    discounted the credibility of plaintiff's husband mainly due to the perception that he testified mostly in the

9    present tense at the July 2000 hearing. Tr. 23.

10        Although the undersigned again finds the ALJ's stated reason to be legally insufficient to reject the

11   testimony of plaintiff's husband, as discussed above, plaintiff has failed to meet her burden of establishing

12   she is disabled based on the medical evidence in the record.  Accordingly, the ALJ's error here also was

13   harmless.  Therefore, contrary to plaintiff's argument, crediting the testimony of plaintiff's husband as true

14   under <u>Lester</u> is inappropriate as well.

15   V.    <u>The ALJ Properly Assessed Plaintiff's Residual Functional Capacity</u>

16        If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must

17   identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for

18   work-related activities." SSR 96-8p.  A claimant's residual functional capacity assessment is used at step

19   five to determine whether he or she can do other work, "considering his or her age, education, and work

20   experience." SSR 96-8p.  In other words, residual functional capacity is what the claimant "can still do

21   despite his or her limitations." <u>Id.</u>

22        A claimant's residual functional capacity is the maximum amount of work the claimant is able to

23   perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work

24   must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only those

25   limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a

26   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

27   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

28   medical or other evidence." <u>Id.</u>

Plaintiff argues the ALJ erred in failing to include in her residual functional capacity assessment any mention of limitations resulting from her multiple sclerosis, knee problems, obesity, high cholesterol, and high blood pressure.  As discussed above, however, plaintiff has failed to establish that any of these impairments, alone or in combination, caused her significant limitations prior to her date last insured based on the medical evidence in the record.  As such, the ALJ was not required to include any such limitations in his assessment of plaintiff's residual functional capacity.

Plaintiff also argues the ALJ failed: (1) to include any limitations from plaintiff's left shoulder, arm and finger problems; and (2) to provide any rationale for not accepting the opinion of Dr. Timothy Smith, the non-examining physician in the record, regarding plaintiff's feeling and reaching limitations.  Because the medical evidence in the record does not support plaintiff's assertion that she had significant limitations in her left upper extremity prior to her date last insured, the ALJ did not err in excluding them.

In July 1989, plaintiff reported improvement with respect to her symptoms of paresthesias in her left arm after having undergone manipulation by a chiropractor, although she continued to have numbness. Tr. 540.  In August 1989, Dr. Searle found she had paresthesia in her left cervical distribution, but noted that it seemed to be resolving. Tr. 537.  In September 1989, Dr. Searle again found plaintiff's symptoms had resolved except for "some persistent numbness" in the fingertips of her left hand. Tr. 538.

In January 1991, plaintiff's sensorium examination was clear, and in March 1991, she had normal sensation in all four extremities. Tr. 161, 515.  In July 1991, Dr. Wambaugh found plaintiff had normal strength and only "slightly relative decreased sensation" in her right arm compared to the left. Tr. 164.  Testing of the hands produced "a very slight decrease in sensation" on the left. Id.  Similar findings were made again in November 1991, and she was diagnosed with possible left carpal tunnel syndrome. Tr. 162.

Plaintiff reported numbness in all of the fingertips of her left hand in May 1993, and Dr. Searle felt she might have mild carpal tunnel syndrome. Tr. 158.  However, the symptoms were "non-progressive," and Dr. Searle did not think it was a neuropathy. Id.  He recommended no further treatment at that time. Id.  His examination of plaintiff in September 1993, found her extremities to be within normal limits, with no motor or sensory deficit. Tr. 89.  Although plaintiff told Dr. Wood that she had a one year history of left finger numbness in November 1993, he noted that she was not under any "active treatment" for it, and that she was "not awakened at night by symptoms." Tr. 154.  He further noted she had "full range of motion" in

1   her left upper extremities. Id.

2        It was not until well after plaintiff's insured status expired that her left upper extremity problems

3   seemed to have increased in severity, although even then the evidence in the record concerning the extent of

4   her impairment is somewhat ambiguous. Tr. 112, 119, 121-22, 148, 449, 478-79, 485.  With respect to

5   plaintiff's complaints of numbness and tingling, furthermore, Dr. Aigner observed they seemed to "vary

6   from one side to the other," and they "were not associated with impairment of function" prior to her date

7   last insured. Tr. 628.  Thus, the ALJ was not required to address the limitations Dr. Smith placed on

8   plaintiff's ability to reach and feel, as they were inconsistent with the weight of the medical evidence in the

9   record. Tr. 384; Vincent, 739 F.3d at 1394-95 (ALJ must only explain why "significant probative evidence

10  has been rejected") (emphasis added); Lester, 81 F.3d at 830-31 (nonexamining physician's opinion may

11  constitute substantial evidence if consistent with other independent evidence record).

12  VI.    The ALJ Properly Found Plaintiff Capable of Doing Other Work in the National Economy

13       If the claimant cannot perform his or her past relevant work, at step five of the disability evaluation

14  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

15  able to perform. Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through

16  the testimony of a vocational expert. Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

17  1162 (9th Cir. 2000).   An ALJ's findings will be upheld if the weight of the medical evidence supports the

18  hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler,

19  753 F.2d 1450, 1456 (9th Cir. 1984).

20       The vocational expert's testimony must be reliable in light of the medical evidence in the record to

21  qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Thus, the ALJ's

22  description of the claimant's disability "must be accurate, detailed, and supported by the medical record."

23  Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those

24  limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (because ALJ

25  included all limitations he found to exist, and those findings were supported by substantial evidence, ALJ

26  did not err in omitting other limitations claimant failed to prove).

27       Plaintiff argues the hypothetical question the ALJ posed to the vocational expert at the April 2003

28  hearing omitted significant limitations present as of her date last insured, such as limitations on her ability to

reach and feel, and limitations resulting from her knee impairments, carpal tunnel syndrome, obesity, and high blood pressure.  That hypothetical question reads in relevant part:

> We have a younger individual.  I think 44 to 46 way back then.  And a high school education, and past work as described.  I guess documented here very certainly is a seizure disorder.  Apparently, was controlled to the point that she got her license back at some point.  But at least she had documented seizure disorder.  There's mention of a knee problem and possible [multiple sclerosis].  You heard the doctor here.  She might've had it, she might not.  It just wasn't enough to be disabling at that point. . . . Exertionally, let's start with light.  But the usual seizure precautions.  Heights, ladders, stairs, rough ground, open water, dangerous machinery.  Any way you could get yourself in trouble if you had a transient loss of consciousness. . . . Not to pass out, but just a loss of awareness. . . . Any ideas?  Or people around her are safe, I guess. . . . I'd say, not stand all day six or eight hours . . . but stand probably a couple of hours.  Need to sit down and stand again.

Tr. 631-32.  As discussed above, the ALJ properly excluded from his assessment of her residual functional capacity assessment the limitations plaintiff argues should have been included in the hypothetical question posed to the vocational expert.  Thus, the ALJ did not err in declining to include them in the hypothetical question as well.

For the same reason, plaintiff's argument that her left finger numbness and limitations on reaching precluded her from being able to perform the job of hotel/motel clerk and office helper also fails.  As the ALJ correctly found:

> Counsel sought to impeach the vocational expert's testimony by including . . . numb hands, but this was intermittent and only involved fingertips on one hand (Exhibit 3F, p. 46).  I do not consider these particularly disabling, as they appear to be very intermittent and short lived. . . . Counsel's impeachment was thus unsuccessful, and I accept the vocational expert's testimony.

Tr. 25.  Even if the evidence in the record had supported plaintiff's arguments regarding finger numbness and inability to reach, the vocational expert testified that such limitations would not be a significant issue at least for the hotel/motel clerk job.  Tr. 635.  Finally, although the job of wireworker may be described in the Dictionary of Occupational Titles ("DICOT") as being light work, and not sedentary work as the vocational expert testified, the ALJ still properly found plaintiff to be capable of performing a significant, albeit modified, range of light work.  Tr. 24, 26-27, 634; DICOT 728.684-022.

VII.   The Issue of Whether the ALJ Re-Opened Plaintiff's Prior Application Is Moot

The doctrine of *res judicata* "should not be rigidly applied in administrative proceedings."  Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (*res judicata* is applied less rigidly to administrative proceedings than to judicial proceedings).  It may be applied "to bar

reconsideration of a period with respect to which [the Commissioner] has already made a determination, by declining to reopen the prior application." Lester, 81 F.3d at 821.  In general, the Commissioner's refusal to reopen a decision regarding an earlier period "is not subject to judicial review." Id.

Administrative *res judicata* does not apply, however, if the ALJ "considers 'on the merits' whether the claimant was disabled during an already-adjudicated period." Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001) (citing Lester, 81 F.3d at 827 n. 3).  Plaintiff argues that because the ALJ considered medical evidence in the record related to her prior disability benefits application, the ALJ *de facto* re-opened that application.  However, because, as discussed above, the ALJ did not err in finding plaintiff not disabled, the issue of whether or not the ALJ *de facto* re-opened plaintiff's prior application is moot.

                                        CONCLUSION

After reviewing the facts and the balance of the record, the Court should find the ALJ properly concluded plaintiff was not disabled.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 4, 2005**, as noted in the caption.

DATED this 9th day of February, 2005.


                              /s/ Karen L. Strombom
                              Karen L. Strombom
                              United States Magistrate Judge